**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 17, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TIMOTHY C. DIETZ, an individual,

     Plaintiff - Appellee/Cross Appellant,

v.

CYPRESS SEMICONDUCTOR
CORPORATION, a California corporation,

     Defendant - Appellant/Cross
     Appellee.

_____

CYPRESS SEMICONDUCTOR
CORPORATION,

     Petitioner,

v.

ADMINISTRATIVE REVIEW BOARD,
UNITED STATES DEPARTMENT OF
LABOR,

     Respondent.

------------------------------

TIMOTHY C. DIETZ,

     Intervenor.

_____

Nos. 16-1209 & 16-1249
(D.C. No. 1:16-CV-00832-LTB)
(D. Colo.)

Nos. 16-9523 & 16-9534
(LABR No. 15-017)
(Department of Labor (except OSHA))

CYPRESS SEMICONDUCTOR
CORPORATION,

     Petitioner,

v.

ADMINISTRATIVE REVIEW BOARD,
U.S. DEPARTMENT OF LABOR,

     Respondent.

------------------------------

TIMOTHY C. DIETZ,

     Intervenor.

No. 16-9529
(LABR No. 15-047)
(Department of Labor (except OSHA))

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ** and **EBEL**, Circuit Judges.[1]
_____

Section 806 of the Sarbanes-Oxley Act of 2002 (Sarbanes-Oxley) protects

whistleblowers from retaliation when they inform their company about conduct

which they reasonably believe violates any one of certain enumerated federal laws,

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] The Honorable Neil Gorsuch participated in the oral argument but not in the decision in this case. The practice of this Court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal. See 28 U.S.C. § 46(d); see also United States v. Wiles, 106 F.3d 1516, 1516, n.* (10th Cir. 1997) (noting that this Court allows remaining panel judges to act as a quorum to resolve an appeal). In this case, the two remaining panel members are in agreement.

including mail fraud and wire fraud. 18 U.S.C. § 1514A. In this case, Timothy Dietz complained to his employer Cypress Semiconductor Corporation (Cypress) that it concealed a peculiar compensation scheme from new employees when they joined the company, which Dietz believed amounted to federal mail fraud and wire fraud. He then allegedly suffered retaliation in the form of disciplinary action and constructive discharge. The question presented is whether Dietz's whistleblower complaint constituted protected activity under Sarbanes-Oxley. We hold that it did not.

## I. BACKGROUND

### A. Cypress and the Bonus Plan

Dietz was working for Ramtron International Corporation (Ramtron) when Cypress acquired Ramtron in November 2012. Cypress extended offers to some former Ramtron employees, including Dietz, inviting them to join the new company. The offer letters outlined the basic terms and conditions of employment, including expected salary and that the employment with Cypress would be at-will. Cypress also stated it would honor the Ramtron severance package if the employee chose to leave Cypress within one year. In other words, working for Cypress and quitting within one year would entitle the employee to the same benefits as if he turned down employment with Cypress in the first instance. Dietz accepted the offer to become a program manager at Cypress.

The Cypress offer letters, however, omitted one important term of employment which is the focus of this lawsuit. Cypress did not reference or explain that some of

3

the former Ramtron employees would be subject to a unique compensation scheme called the Design Bonus Plan (Bonus Plan) created by one of Cypress's cofounders.

This Bonus Plan involved a mandatory wage deduction under which certain employees working on certain projects would forfeit ten percent of their salary until six weeks after the close of each quarter, at which time they would receive a bonus based on a review of their projects' performance. If a qualifying project was behind schedule, then every eligible employee on the team would receive a bonus that was less than the initial deduction, resulting in a net loss in salary for that quarter; but if a project was ahead of schedule, the bonus would normally exceed the initial deduction—sometimes by a substantial margin—resulting in a net gain for the employees on the team. On average, bonus-eligible employees received a net salary that was twenty-seven percent higher than their pre-bonus salaries, although some employees ultimately lost money in certain quarters due to their projects' underperformance. Further, the potential bonus was subject to forfeiture if an employee left before a quarterly payout.

This scheme was not described in the offer letters given to Ramtron employees. A Cypress executive justified the omission on the ground that there was "no way of knowing which employees would be" subject to the Bonus Plan at the time Cypress acquired Ramtron. AR 1215. The Bonus Plan only applied to certain employees, normally design engineers, associated with certain launch projects. And because of what Cypress perceived as a lack of "management rigor" at Ramtron, Cypress was unable to clearly define at the time of acquisition which existing

4

projects at Ramtron would eventually be eligible for the Bonus Plan. Id. For this reason, it did not include the Bonus Plan details in the Ramtron offer letters.

Nevertheless, Cypress did not start making deductions from the former Ramtron employees' paychecks until August 2013—approximately nine months after the Ramtron employees came on board. That is because the first Bonus Plan-eligible project on which they would work did not launch until late March 2013, and Cypress's policy was to pay the employees' first 18 weeks' contributions before beginning deductions from their paychecks.

Before Cypress began making these compulsory deductions, it attempted to apprise Ramtron employees of the Bonus Plan's details. In December 2012, a Design Center Manager named David Still met with them and explained the Bonus Plan. Then, in April 2013, the Design Bonus Administrator, Ryan Wellsman, conducted a training session for the Ramtron employees regarding the Bonus Plan. Further, at all relevant times Cypress described the Bonus Plan in detail on the company's intranet, which was accessible by all employees.

Cypress also required that any employee participating in a launched project acknowledge they have read a document known internally as the Design Governing Spec, which includes a discussion of the Bonus Plan. Then, as a condition of participating in a Bonus-Plan eligible project, each qualifying employee was required to write a memo acknowledging the aspects of the Bonus Plan that were relevant to the project team. All of this was done with respect to the Ramtron employees' first

5

eligible project, the TR-20005, *before* Cypress started deducting anything from their paychecks around August 2013.

## B. Dietz's Whistleblower Complaint

On April 12, 2013, after one of the Bonus Plan training sessions, Dietz e-mailed his supervisor, James Nulty, expressing concern about the legality of the Bonus Plan under California and Colorado wage laws. On April 22, 2013, Dietz had a follow-up phone conversation with Cypress's General Counsel, Victoria Valenzuela during which he made the same assertion—that the Bonus Plan violated state wage laws. In addition to his state-law complaint, Dietz told Valenzuela that the Bonus Plan took the Ramtron employees by surprise. He said that the Ramtron offer letters conveyed to employees "what their salary [was] going to be and *then you change the game.*" AR 1307 (emphasis added). Valenzuela assured Dietz that there was no legal problem with the Bonus Plan itself and that Ramtron employees had been properly apprised of the scheme.

## C. Cypress's Alleged Retaliation

Shortly after his conversation with Valenzuela, Dietz began having trouble with his supervisor Nulty. In late May 2013, Nulty arranged a phone meeting with Dietz and others to go over some recent concerns about Dietz's performance. In particular, Nulty was troubled by three observations: (1) Dietz had updated his project schedule to show a three-week delay for an important milestone that was

6

fourteen weeks away, (2) Dietz did not immediately notify a supervisor when another manager pulled one of Dietz's employees off of Dietz's project, and (3) Dietz neglected to update the project-management computer system for too long a period. On June 4, 2013, after the teleconference, Nulty memorialized these concerns in a written memo to be placed indefinitely in Dietz's personnel file. The memo instructed Dietz to prepare a memo explaining what he did wrong and stating that "[a]ny future infractions will result in further disciplinary action, up to and including termination." AR 1401. The ALJ characterized this memo as "career ending." AR 2230.

On June 5, 2013, Dietz responded with a letter disputing the disciplinary allegations. He claimed that Nulty's memo was "unlawful retaliation" for Dietz's complaint regarding the Bonus Plan. AR 1412-13. Then, instead of admitting wrongdoing as Nulty's letter instructed, Dietz countered:

> I will do no such thing, because I have done nothing wrong, and this requirement is nothing more than bullying with legal implications. <u>Therefore, my response is that I am terminating my employment at Cypress.</u> I will agree to stay onboard through July 1 as a professional courtesy to my fellow Cypress employees in Colorado Springs, and to keep the TR20005 project stable while executing an orderly turnover, unless Cypress chooses to terminate my employment sooner.

AR 1413 (emphasis in original). This response "stunned" Cypress managers. AR 1067. But according to Dietz, he was not intending to resign at all—rather, he was triggering a specific employee-retention policy at Cypress called the "Turnaround Process." AR 1249. Under that policy, Cypress would react *quickly* to a valued

7

employee's notice of resignation and attempt to persuade that employee to remain at Cypress.

Cypress's response, however, was not immediate. The next day, June 6, 2013, Nulty responded with an invitation for Dietz to attend a meeting for the following day—an invitation with no attached agenda, which Dietz believed was unusual at Cypress. Dietz called Nulty about the upcoming meeting but could not reach him. Because Nulty had waited a full day to respond to the resignation notice, because the invitation had no agenda, and because he could not get in touch with Nulty, Dietz concluded that Cypress was not adhering to its turnaround process and was planning to terminate him. Dietz believed the writing was on the wall and the axe was about to fall. Thus, on June 7, 2013, before the scheduled meeting he notified Cypress that his resignation was effective immediately. That was his last day at Cypress.

### D. **Procedural History**

In August 2013, Dietz filed this lawsuit for unlawful retaliation with the Occupational Safety and Health Administration (OSHA), which investigates and adjudicates complaints on behalf of the Department of Labor (DOL). The Regional Administrator of OSHA denied Dietz's claim for relief. Dietz appealed to an administrative law judge (ALJ) who found in his favor. The ALJ awarded Dietz $654,906.00 in front pay, $220,105.85 in back pay, $31,199.08 in back benefits, immediate vesting of 3,512 shares of Cypress stock and 2,041 shares of Cypress stock options, interest, costs, and attorneys' fees.

8

Cypress then appealed to the Administrative Review Board (the Board), which affirmed the ALJ's decision and awarded relief to Dietz in March 2016. Cypress now petitions this Court for review of the Board's merits decision. Appeal No. 16-9523. Subsequently the Board affirmed the ALJ's decision awarding Dietz attorney fees and costs incurred before the ALJ, and then awarded attorney fees and costs for litigation before the Board. Cypress petitions this Court for review of those orders as well. Appeal Nos. 16-9529, 16-9534.

Having won his case before the Board, Dietz filed a civil action in the district court to enforce the Board's orders against Cypress. In May 2016, the district court entered judgment for Dietz, and Cypress timely appealed to this Court. Appeal No. 16-1209. When Cypress appealed the case, it posted a supersedeas bond, which the district court treated as an automatic stay under Fed. R. Civ. P. 62. Dietz then cross-appealed on that issue, arguing that the district court lacked jurisdiction to stay the judgment against Cypress. Appeal No. 16-1249.

In December 2016, we consolidated the petitions for review, Nos. 16-9523 (merits), 16-9529 (fees and costs before the ALJ), 16-9534 (fees and costs before the Board), with the appeals from the district court, Nos. 16-1209 (appeal), 16-1249 (cross-appeal).

## II. STANDARD OF REVIEW

"The Board's factual determinations may be set aside only if they are 'unsupported by substantial evidence.'" Lockheed Martin Corp. v. Admin. Rev. Bd.,

9

717 F.3d 1121, 1129 (10th Cir. 2013) (quoting 5 U.S.C. § 706(2)(E)).  This standard "requires more than a scintilla but less than a preponderance of the evidence" for the Board's decision to be upheld.  Id.  As for legal determinations, this Court affords administrative deference to the Board's statutory interpretations, as expressed in formal adjudications, under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).  See Lockheed Martin Corp., 717 F.3d at 1131.

## III.  DISCUSSION

### A. Applicable Law

Congress enacted Sarbanes-Oxley "[t]o safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation[.]"  Lawson v. FMR LLC, 134 S. Ct. 1158, 1161 (2014) (citation omitted).  To do this, Section 806 encourages employees of publicly traded companies to report corporate fraud and securities violations by sheltering those employees from retaliation.  18 U.S.C. § 1514A.  It provides:

> No [publicly traded] company . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee . . . to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee *reasonably believes* constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal

10

law relating to fraud against shareholders, when the information or assistance is provided to . . . a person with supervisory authority over the employee . . . .[2]

Id. § 1514A(a)-(a)(1) (emphasis added). Under its plain terms, Sarbanes-Oxley protects whistleblower activity only when the employee *reasonably believes* the company has engaged in certain enumerated federal offenses. See Id. § 1514A(a). This reasonable-belief standard "include[s] both a subjective and an objective component; an employee must actually believe in the unlawfulness of the employer's actions and that belief must be objectively reasonable." Lockheed Martin Corp., 717 F.3d at 1132. At issue in this case is whether it was reasonable for Dietz to believe that Cypress committed mail fraud or wire fraud when it did not disclose the Bonus Plan to the Ramtron employees in their initial offer letters.

The federal mail fraud and wire fraud statutes require: "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails [or wires] to execute the scheme." United States v. Welch, 327 F.3d 1081, 1104 (10th Cir. 2003) (citing 18 U.S.C. §§ 1341, 1343). For the commission of either offense, a person must actually harbor the intent to deprive a victim of property or honest

---

[2] We use the term "publicly traded" company as shorthand for the statute's reference to companies that either have "a class of securities registered under section 12 of the Securities Exchange Act of 1934," or that are "'required to file reports under section 15(d)" of that Act. § 1514A(a); see also Lawson, 134 S. Ct. at 1164.

11

services.[3] Id. at 1105 ("[T]he intent to defraud under §§ 1341 and 1343 is akin to the intent to deceive *in order to deprive* one of property . . . ." (emphasis added)); see also Cleveland v. United States, 531 U.S. 12, 26 (2000) ("We conclude that § 1341 requires the object of the fraud to be 'property' in the victim's hands . . . ."); Pasquantino v. United States, 544 U.S. 349, 355 n.2 (2005) (suggesting that Cleveland's construction of the § 1341 (mail fraud) applies equally to § 1343 (wire fraud)). In other words, it is not enough merely to fraudulently induce a victim to take some action—there must be a conscious objective to *deprive* the victim of property.[4]

Turning to the case before us, the question is whether Dietz reasonably believed that Cypress intended to deprive Ramtron employees of their property when it did not disclose the Bonus Plan in their offer letters.[5] If Dietz could not have

---

[3] Honest-services fraud is not at issue in this case because it is limited to bribery or kickback schemes. See Skilling v. United States, 561 U.S. 358, 408-09 (2010). With that understanding, for convenience this order refers only to property deprivation as the requisite intent of the fraud.

[4] We stress that this intent-to-deprive requirement is not a feature of Sarbanes Oxley itself, but rather is an element of the mail fraud and wire fraud statutes, which are referenced as enumerated offenses in Sarbanes Oxley.

[5] In Sylvester v. Parexel International LLC, No. 07-123, 2011 WL 2165854, at *17-19 (Admin. Rev. Bd. May 25, 2011), the Board indicated that a whistleblower claimant under Sarbanes-Oxley—at least in the context of a securities-fraud complaint to his employer—need not prove or allege the specific elements of the crime he believes that his employer committed. We interpret this to mean that the whistleblower need not show the elements of the crime were *actually* satisfied; but that does not absolve the claimant from showing that he made his whistleblower complaint with the *reasonable belief* that an enumerated offense occurred or was occurring. If the facts known to the claimant could not even reasonably be squared with the elements of a crime referenced in

12

formed such a reasonable belief, then his whistleblower complaint was not protected by Sarbanes-Oxley.

## B. **Dietz's Complaint Was Not Protected By Sarbanes-Oxley**

Dietz could not have reasonably believed that Cypress was engaged in mail or wire fraud, so his complaint was not protected by Sarbanes-Oxley.  There simply was not enough evidence to conclude reasonably that Cypress *intended to deprive* the Ramtron employees of their property by nondisclosure of the Bonus Plan in their offer letters.  At the outset, Cypress offered at least a plausible, non-nefarious explanation for the omission: because the Bonus Plan would only apply to certain employees on certain launched projects, Cypress had "no way of knowing which employees would be" subject to the Bonus Plan at the time of the Ramtron acquisition.  AR 1215.   But even assuming that excuse is insufficient—perhaps because Cypress could have included a disclaimer in the offer letters warning that the employees *might* be subject to the Bonus Plan—the evidence is still woefully inadequate to support any belief that Cypress committed a fraud in order to deprive the employees of their property.

The Ramtron recruits were at-will employees, meaning they could quit for any reason or no reason at all.  Moreover, they could resign within one year of joining Cypress and likely receive the same benefits package they would have gotten had

Sarbanes-Oxley, then the whistleblower cannot be said to have formed a reasonable belief necessary to trigger protection under the statute.

13

they declined to join Cypress in the first instance. And most importantly, Cypress did not start making compulsory deductions under the Bonus Plan until around nine months *after* they signed their offer letters.

During that nine-month period, Cypress made sure they were aware of and understood the Bonus Plan. The company held two training sessions, explained the Bonus Plan on the corporate intranet, and required all qualifying employees to acknowledge the Design Governing Spec (which included the Bonus Plan details) before launching a project governed by the Bonus Plan. In other words, an employee who did not want to participate in the Bonus Plan after learning about it would still have time to decide whether to continue working at Cypress knowing the Bonus Plan would eventually kick in, or to jump ship and get the same severance package it would have received from Ramtron. Putting all this together, Dietz could not reasonably believe that Cypress was engaged in a scheme to cheat Ramtron employees out of their money.

To be sure, there might be some evidence to support the Board's conclusion that Cypress concealed a material fact in order to lure Ramtron employees to work under false pretenses. But as we have said, mail fraud and wire fraud require more than merely fraudulent inducement—there must be a scheme designed to *deprive* the victims of their property. The evidence here does not remotely support the conclusion that Cypress harbored that intent. Therefore, lacking any reasonable belief that Cypress was engaged in one of the enumerated offenses in 18 U.S.C. § 1514A(a)(1), Dietz's whistleblower complaint was not protected by Sarbanes-

14

Oxley. Thus any subsequent adverse employment action against Dietz is not actionable under § 1514A.[6]

## IV. CONCLUSION

Sarbanes-Oxley does not protect Dietz's whistleblower complaint because he did not reasonably believe that Cypress engaged in any of the enumerated offenses in 18 U.S.C. § 1514(a)(1). Accordingly, we GRANT Cypress's petitions for review, Nos. 16-9523, 16-9529, 16-9534, and VACATE the Board's awards for Dietz on the merits and for attorneys' fees and costs.

As for the district court order enforcing the Board's merits award to Dietz, that order is VACATED as moot, as there is nothing now left to enforce. Thus, Appeal

---

[6] This conclusion obviates the need to address the other difficult issues in the case, including whether Dietz reasonably believed the criminal fraud involved the mail or wires, whether Dietz adequately communicated his complaint to Cypress in terms that were specific enough to alert the company that he was alleging federal mail fraud or wire fraud, whether even such a specificity requirement exists in Sarbanes-Oxley, whether Dietz's resignation was a constructive discharge or instead a voluntarily departure from the company, and whether Nulty's June 4, 2013 disciplinary memo was an independent adverse employment action. We rest our disposition solely on the ground that Dietz's complaint was not protected by Sarbanes Oxley because it is logically antecedent to these other issues—he could not reasonably believe that Cypress was engaged in mail fraud or wire fraud so his whistleblower complaint was not protected by Sarbanes-Oxley at all. Nevertheless, although we do not reach the issue, we note our skepticism about Dietz's constructive-discharge argument—the evidence strongly suggests that Dietz voluntarily resigned from Cypress with no unlawful coercion or ultimatum by his supervisors.

15

Nos. 16-1209 and 16-1249 are DISMISSED.[7]

Entered for the Court


David M. Ebel
Circuit Judge

---

[7] The Department of Labor's Consent Motion to File Under Seal Documents Subject to Protective Order is hereby GRANTED.